**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tri-Star Theme Builders, Inc./PCL Construction Services, Inc., a joint venture,<br><br>        Plaintiff,<br><br>vs.<br><br>Hawkeye-Security Insurance Company, an Iowa corporation,<br><br>        Defendant. | No. CV 07-1049-PHX-JAT<br><br>**ORDER** |

Pending before this Court is Plaintiff Tri-Star Theme Builders, Inc./PCL Construction Services, Inc.'s Motion for Summary Judgment (Doc. # 32)[1], and Defendant OneBeacon Insurance Company's Cross Motion for Summary Judgment (Doc. # 70).[2] For the reasons that follow, the Court grants Defendant's motion and, in so doing, denied Plaintiff's motion.

**BACKGROUND**

In October 1997, Plaintiff entered into a contract with the Colorado River Indian Tribes ("CRIT") for the design and construction of CRIT's Blue Water Resort ("Resort").

---

[1] Plaintiff is an Arizona joint venture comprised of Tri-Star Theme Builder, Inc. and PCL Construction Services, Inc.

[2] OneBeacon Insurance Company is the successor-in-interest to Hawkeye-Security Insurance Company.

Construction began on the project in January 1998. In March 1998, Plaintiff entered into a subcontract agreement with Golden West Mechanical ("GWM") for the plumbing and HVAC work at the Resort. Under the subcontract, GWM was required to obtain comprehensive general liability ("CGL") insurance, as well as name Plaintiff as an additional insured ("AI") under the policy.

Defendant issued two insurance policies to GWM ("the policies"). The first policy had a coverage period of March 24, 1998 through March 24, 1999. The second policy had a coverage period of March 24, 1999 through March 24, 2000. Each policy granted AI status to Plaintiff. Specifically, the AI endorsements contained the following parameters:

> Who is an insured is amended to include as an insured the person or organization shown in the schedule [Plaintiff], but only with respect to liability arising out of your ongoing operations performed for that insured on the project designated in the schedule, and only to the extent of liability resulting from occurrences arising out of your negligence. (PSOF Ex. A, Attachment 8, pp. 10-11; Attachment 9, pp. 141-42.)

In April 1999, Plaintiff issued to CRIT a certificate of substantial completion for the Resort. In June 1999, CRIT opened the Resort to the general public. Before and after the Resort opened, CRIT provided Plaintiff "with punch lists of defects and other items requiring repair and correction" by Plaintiff. (PSOF Ex. A, Attachment 2, ¶ 30.) Additionally, after the Resort was opened, CRIT discovered "other substantial and material defects in the design and construction of the Resort." (Id. at ¶ 31.)

In November 2003, CRIT filed a complaint ("the underlying complaint") in Maricopa County Superior Court alleging breach of contract, negligence, breach of warranty, and for recovery under a performance bond. In January 2005, Plaintiff sent a letter to Defendant with a copy of the underlying complaint. In the January 2005 letter, Plaintiff tendered for coverage CRIT's lawsuit against Plaintiff. In a February 2005 letter, Defendant acknowledged Plaintiff's letter, but requested additional information and documents from Plaintiff. In May 2005, Plaintiff sent through U.S. Mail Defendant's requested information.

1   In November 2005, Plaintiff sent a second request for coverage both via U.S. Mail and facsimile. Defendant did not respond to either request.[3]

In September 2006, the CRIT's state court action against Plaintiff was settled, with PCL Construction Services, Inc. paying $16,000,000. In April 2007, Plaintiff brought the present action in Maricopa County Superior Court, alleging breach of contract. In May 2007, Defendant removed to this Court.

## ANALYSIS

### *Summary Judgment Standard*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, summary judgment is mandated, "...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec.*

---

[3] Defendant asserts that it received neither Plaintiff's May 2005 mailing nor Plaintiff's November 2005 mailing and facsimile. Thus, Defendant argues that Plaintiff never properly tendered its claim for defense and coverage from the underlying complaint. However, because the Court concludes that the facts contained in the underlying complaint coupled with the materials sent in Plaintiff's May 2005 mailing do not trigger Defendant's AI endorsement, the Court need not determine whether Defendant received Plaintiff's mailings, nor whether it should be presumed that Defendant received such mailings.

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247-48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

*Arizona Law Applies*

The instant action was removed to this Court on the basis of diversity jurisdiction. As such, the Court must apply Arizona law in resolving the parties dispute. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Insurance Co. N. Am. v. Fed. Express Corp.*, 189 F.3d 914, 919 (9th Cir. 1999).

In Arizona, the interpretation of an insurance contract is an issue of law. *Coombs v. Lumbermen's Mut. Cas. Co.*, 531 P.2d 1145, 1147 (Ariz. Ct. App. 1975). Insurance contracts are to be construed according to their plain and ordinary meaning. *Sparks v. Republic Nat. Life Ins. Co.*, 647 P.2d 1127, 1132 (Ariz. 1982). If the language in the policy is unclear and is reasonably susceptible to more than one interpretation, there is an ambiguity and such ambiguity will be construed against the insurer. *Ranger Ins. Co. v. Lamppa*, 563 P.2d 923, 925 (Ariz. Ct. App.1977). "In determining whether an ambiguity exists in a policy, the language should be examined from the viewpoint of one not trained in law or in the insurance business." *Sparks*, 647 P.2d at 1132. The Court must enforce the contract as made, and it is not the prerogative of the courts "to create ambiguities where none exist or to rewrite the contract in an attempt to avoid harsh results." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Rick*, 134 Ariz. 122, 128, 654 P.2d 56, 62 (Ariz. Ct. App. 1982).

///

///

*Ongoing Operations*

The parties have raised several arguments in their cross motions for summary judgment. However, the Court need not address all of the parties arguments because the dispositive issue before the Court is whether the allegations contained in the underlying complaint invoke the coverage of the policies. Because the Court concludes that the underlying complaint fails to do so, the Court need not reach the parties' other arguments.

In Arizona, whether an insurer has a duty to defend is determined by the allegations made against the insured. *Lennar Corp. v. Auto-Owners Ins. Co.*, 151 P.3d 538, 544 (Ariz. Ct. App. 2007). "In evaluating whether [the insurer] had a duty to defend, the question whether the alleged liability of [the general contractor] 'arose out of' [the subcontractor's] work must be determined initially from the allegations in the complaint against [the general contractor] and the facts known at that time." *Regal Homes, Inc. v. CNA Ins.*, 171 P.3d 610, 615 (Ariz. Ct. App. 2007). If the allegations in the underlying complaint implicate any of Defendant's insurance coverage that is applicable to Plaintiff as a named insured, then Defendants owed a duty to defend Plaintiff. *Lennar*, 151 P.3d at 544.

In the underlying complaint, GWM is not a named defendant, nor is it specifically cited in any of the allegations. Nevertheless, Plaintiff urges that the allegations pertaining to plumbing and HVAC work at the Resort suffice to implicate the work of GWM. However, even if the Court assumes that the work of GWM is implicated in the underlying complaint, the underlying complaint fails to allege any damage that is covered by the AI endorsement under the policies.

The pertinent portions of the CGL policy provides as follows:

    SECTION I - COVERAGES

    COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

        1. Insuring Agreement.

        a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which

this insurance applies. We will have the right and duty to defend that insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this Insurance does not apply. (PSOF Ex. A, Attachment 8, p. 71; Attachment 9, p. 186.)

. . . .

B. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period. (*Id.*)

. . . .

2. Exclusions.

This Insurance does not apply to:

. . . .

(j) Damage to Property.

"Property damage" to:

. . . .

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. (*Id.* at p. 73; p. 189.)

. . . .

SECTION V - DEFINITIONS

. . . .

12. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. (*Id.* at p. 81; p. 197.)

. . . .

15. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. (*Id.* at p. 82; p. 198.)

However, the AI endorsement contained the following limitations:

> Who is an insured is amended to include as an insured the person or organization shown in the schedule [Plaintiff], but only with respect to liability arising out of your *ongoing operations* performed for that insured on the project designated in the schedule, and only to the extent of liability resulting from occurrences arising out of your negligence. (*Id.* at pp. 10-11; pp. 141-42.)

(Emphasis added.) Finally, the policies contain the following endorsement:

> ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENT WITH YOU.
>
> This endorsement modifies insurance provided under the following:
>
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
>
>   A. Who is an Insured (Section II) is amended to include as an insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability arising out of your *ongoing operations* performed for that Insured. A person's or organization's status as an Insured under this endorsement *ends when your operations for that Insured are completed*. (*Id.* at p. 86; p. 199.)

  The phrase "ongoing operations" is not defined by the policies. Likewise, Arizona courts have not had occasion to construe this phrase. "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." Ticknor v. Choice Hotels Int'l, Inc., 265 F.3d 931, 939 (9th Cir. 2001) (quotation omitted). In so doing, the Court must, under Arizona law, construe the undefined phrase according to "the common sense terms of the average layman." *Malanga v. Royal Indem. Co.*, 422 P.2d 704, 707 (Ariz. 1967).

  The word "ongoing" is defined as "that [which] is actually in process," and "that [which] is continuously moving forward." WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY OF THE ENGLISH LANGUAGE 1577 (1966). The term "operation" is defined as "doing or performing, especially of action: work," and "production." *Id.* at 1581. Construed together, the Court believes the common sense interpretation of "ongoing operations" is *the performance of work actually in process*. Applying this interpretation to the present action, the Court finds that the AI endorsement only applies to liability arising out of GWM's work that is actually in process at the Resort.

Plaintiff argues that the phrase "ongoing operations" in the AI endorsement should be interpreted to mean that any damages "related to" the ongoing operations of GWM must be covered by the policies, regardless of when the damages are discovered. The Court disagrees. Plaintiff's proffered interpretation erases the distinction between ongoing operations coverage and completed operations coverage. Any claim for personal injury or property damage related to a subcontractor's work will, necessarily, relate back to the period of time when the subcontractor was working on the project. This is so because any action in the causation chain that a subcontractor sets in motion will inevitably relate back to the subcontractor's negligent actions or faulty workmanship, which can only occur while the subcontractor is still working on the project. Thus, the only meaningful distinction between the two types of coverage becomes one of when the damages manifest themselves: during the subcontractor's ongoing operations or after the subcontractor's work is completed? If the latter, then an AI endorsement containing ongoing operations language will not provide coverage.[4]

The Court's interpretation of the phrase "ongoing operations" in the AI endorsement is supported by another endorsement contained in the polices. The endorsement entitled "Additional Insured - Owners, Lessees or Contractors - Automatic Status when Required in Construction Agreement with You," provides the following limitations: "Such person or

---

[4] Such an interpretation does not leave contractors without coverage for damages that occur after the work is completed. Rather, if a contractor desires coverage for such damages, the contractor need only ensure that it obtains completed operations coverage.

- 8 -

organization is an additional insured only with respect to liability arising out of your *ongoing operations* performed for that Insured. A person's or organization's status as an Insured under this endorsement *ends when your operations for that Insured are completed*." (PSOF Ex. A, Attachment 8, p. 86; Attachment 9 at p. 199.) (Emphasis added.) The fact that a contractor's automatic status as an additional insured ends when the operations of the subcontractor are completed further strengthens the Court's conclusion that "ongoing operations" applies only to liability arising out of the subcontractor's work that is actually in process. Once a subcontractor completes the contracted work, ongoing operations coverage no longer applies, as reinforced by the automatic AI endorsement contained in the policies. Only damages that manifest themselves during the subcontractor's work actually in process are covered under such an endorsement.

The Court's conclusion is further bolstered by a comparison of the policy coverage available to GWM as opposed to that afforded to Plaintiff under the AI endorsement. As discussed previously, the AI endorsement narrows coverage to only those occurrences that take place during GWM's "ongoing operations." The policy coverage afforded to GWM, however, contains no such limitation. Rather, GWM's coverage provides: "[t]his insurance applies to 'bodily injury' and 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and(2) The 'bodily injury' or 'property damage' occurs during the policy period." (PSOF Ex. A, Attachment 8, p. 71; Attachment 9, p. 186.) The use of two different coverage types within the same policy signals that the two types of coverage should be afforded different meanings.

Recent decisions in courts of other jurisdictions are consistent with the Court's interpretation of the phrase "ongoing operations." The first such court to do so was the Fourth District of the Court of Appeal of California in *Pardee Construction Co. v. Insurance Co. of the West*, 92 Cal.Rptr.2d 443 (Cal. Ct. App. 2000). In *Pardee*, the court held that the endorsements in the policy before the court pertained to completed operations. In order to

support its conclusion, albeit in dictum, the court noted the history and difference between ongoing operations coverage and completed operations coverage:

> Moreover, in 1993, the Insurance Services Office (ISO) revised the language of the form 2010 endorsement utilized by the insurance industry to expressly restrict coverage for an additional insured to the "ongoing operations" of the named insured. This revised language effectively precludes application of the endorsement's coverage to completed operations losses. . . . The restriction of coverage in the two endorsements to only ongoing operations makes it clear that additional insureds will have no coverage under the named insured's policy for liability arising out of the products-completed operations exposure. . . . Similarly, construction industry and underwriting spokespersons have echoed this assessment: ". . . Prior to the 1993 . . . revisions, the standard ISO additional insured endorsements provided the additional insured with coverage for liability arising out of 'your operations performed for' the additional insured, which included completed operations. More recent editions of these endorsements provide coverage only with respect to 'your ongoing operations,' which effectively eliminates coverage for completed operations."

*Pardee*, 92 Cal.Rptr. at 456 (citations omitted). Thus, the court in *Pardee* recognized the distinction between coverage with respect to "ongoing operations" and coverage with respect to completed operations.

In *Weitz Co., LLC v. Mid-Century Insurance.*, 181 P.3d 309 (Colo. Ct. App. 2007), the Colorado Court of Appeals interpreted an AI endorsement containing the same "ongoing operations" language to mean that the endorsement did not provide coverage to the general contractor for liability arising out of the subcontractor's completed operations. In so doing, the court cited the following commentator with approval:

> The difference between "your work" and "your ongoing operations" is that "your work," within the parameters of the [commercial general liability] definition, can be either work in progress or work that has been completed; "ongoing operations is not a defined [commercial general liability] term, but suggests work only for as long as it is actually being performed. In short, coverage for the additional insured with respect to the named insured's completed operations was clearly present in the original edition of CG 20 10. The insurance industry sought to remove that component of coverage by insuring only liability arising out of the named insured's ongoing operations–or work in progress–beginning with the 1993 version of the endorsement.

*Weitz*, 181 P.3d at 314 (quoting D. MALECKI, P. LIGEROS & J. GIBSON, THE ADDITIONAL INSURED BOOK 184 (5th ed. 2004)).

- 10 -

The Washington Court of Appeals agreed with these conclusions concerning the proper understanding of the phrase "ongoing operations." In *Hartford Insurance Co. v. Ohio Casualty Insurance Co.*, 189 P.3d 195 (Wash. Ct. App. 2008), the court was confronted with a similar argument as proffered by Plaintiff in this case: if the property damage arose out of the ongoing operations of the subcontractor, the general contractor was covered under the AI endorsement even if the subcontractor had completed operations before the claim was asserted. "In other words, it is the origin of the defect, not when the claim was made, that matters." *Hartford*, 189 P.3d at 201. The *Hartford* court rejected this argument, holding that coverage under an AI endorsement is limited to coverage for property damage "arising out of the subcontractors' work in progress only." *Id.* at 202. *See also Royal Indem. Co. v. Am. Family Mut. Ins. Co.,* 2008 WL 4378737 (D. Colo. 2008) ("[T]he First Amended Complaint in the underlying case alleges liability for property damage that was first observed after the buildings were substantially completed following transition to homeowner control. . . . I conclude that under the meaning of 'arising out of ongoing operations' the endorsement of the policy does not cover completed operations and [the insurers] had no duty to defend or indemnify.").

*Allegations of the Underlying Complaint*

The Court must determine whether the underlying complaint sufficiently alleges damages to the Resort caused by GWM that manifested themselves while GWM was still working on the project. The pertinent allegations contained in the underlying complaint are as follows:

> Before the Resort was opened and thereafter, CRIT provided Tri-Star/PCL with punch lists of defects and other items requiring repair and correction by Tri-Star/PCL. Tri-Star/PCL failed to adequately or timely remedy those deficiencies as required by the Design/Build Contract. (PSOF Ex. A, Attachment 2, ¶ 30.)
>
> Additionally, after the Certificate of Substantial Completion was issued and after the Resort was opened, CRIT discovered other substantial and material defects in the design and construction of the Resort for which Tri-Star/PCL is responsible under the Design/Build Contract and by law. (*Id.* at ¶ 31.)

. . . .

        By way of illustration and without limitation, the Resort contains the following defects in design and/or construction, which breach the Design/Build Contract and fail to conform to applicable standards of care and code requirements, and which have caused resulting damage to other property as described below: (*Id.* at ¶ 33.)

. . . .

        Failure to provide appropriate flow control devices on the waterside of the HVAC system, preventing balancing of the system and resulting in increased operations costs; (*Id.* at ¶ 33g.)

        Defective design and/or failure to install an appropriate cooling system with adequate redundancy as required by the Design/Build Contract. Cooling system defects have caused resulting damage that includes, without limitation, lost revenues and out-of-pocket expenses caused by cooling system failures; rental expenses for cooling towers; and repair costs incurred by CRIT to install an alternative cooling tower system as specified; (*Id.* at ¶ 33h.)

. . . .

        The defects and deficiencies in the Resort, including the specific defects described in Paragraph 33 above, have caused resulting damage to other property and portions of the Resort, including without limitation the damage described in the foregoing paragraph. (*Id.* at ¶ 34.)

GWM's work on the Resort was completed no later than June 15, 1999, the date the Resort opened to the public. In order for Defendant's duty to defend to properly attach, the complaint must contain allegations of damages that arose while GWM's work on the Resort was still in progress. Thus, the allegations must pertain to the time period before the Resort was open to the public.

The only allegation pertaining to the time frame before the Resort was open to the public is contained in paragraph 30 of the underlying complaint. Paragraph 30 alleges that "[b]efore the Resort was opened and thereafter, CRIT provided Tri-Star/PCL with punch lists of defects and other items requiring repair and correction by Tri-Star/PCL." It is not clear from the complaint what these defects pertain to, much less how they implicate the work of GWM. The punch lists of defects may or may not have been concerned with GWM's work.

However, the underlying complaint fails to adequately imply that the punch lists pertain to the work of GWM. Moreover, the underlying complaint does not allege what other damages, if any, resulted from the defects on the punch lists. As such, paragraph 30 of the underlying complaint fails to adequately invoke Defendant's duty to defend.[5]

Paragraph 31 of the underlying complaint expressly alleges damages that manifested themselves after the opening of the Resort. Based upon the Court's interpretation of "ongoing operations" language contained in the AI endorsement, such an allegation is inadequate to elicit Defendant's duty to defend.

The allegations contained in paragraphs 33 and 34 of the underlying complaint arguably apply to GWM's work. However, the underlying complaint is again silent concerning the date that the damages resulting from the defects alleged in paragraphs 33 and 34 became evident. Because the underlying complaint fails to allege that the damages resulting from the defects in paragraphs 33 and 34 occurred and manifested themselves during the time period that GWM was still working on the Resort, paragraphs 33 and 34 likewise fail to invoke Defendant's duty to defend.

*Other Facts Known*

Plaintiffs also argue that in addition to the allegations contained in the complaint, Defendant's duty to defend was triggered by the documents sent in the May 2005 mailing. Plaintiffs assert that these documents coupled with the allegations contained in the underlying complaint contain enough facts to trigger Defendant's duty to defend. The Court agrees that additional facts known to an insurance company must be considered in determining whether a duty to defend has been triggered. *See Lennar*, 151 P.3d at 547

---

[5] The Court also notes that it appears that the allegations in paragraph 30 of punch list defects are likely excluded under the I.2.j.5 exclusion ("That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations;") and the I.2.j.6 exclusion ("That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it.").

- 13 -

("[A]ccording to Arizona law, once an insured makes some factual showing that the suit is actually one for damages resulting from events that fall under policy terms, an insurer has a duty to investigate those facts and provide a defense when indicated."); *Aetna Cas. & Sur. Co. v. Dannenfeldt*, 778 F.Supp. 484, 499 (D. Ariz. 1991) ("Under modern notice pleading rules, the insurers' license to rely on the pleadings is subject to exceptions. The insurer cannot rely on the pleadings alone where the allegations are in conflict with facts known or facts reasonably ascertainable by the insurer.") (quotation omitted). Here, however, even assuming Defendant had full knowledge of the items contained in Plaintiff's May 2005 mailing, Defendant's duty to defend was not triggered.

The Court has reviewed the documents that were contained in Plaintiff's May 2005 mailing. There is little question that the documents demonstrate in great detail that damages occurred at the Resort. However, whether damages occurred is not the appropriate question. Rather, the question is whether the documents contain enough facts to demonstrate that the damages that occurred at the Resort during GMW's "ongoing operations." The documents are silent concerning GMW or any of the work that GMW performed. There are no facts contained in the documents that even remotely connect the damages at the Resort to GMW's ongoing operations. Morever, Plaintiff cannot expect to drop hundreds of pages of documents onto the lap of an insurance company–most of which are irrelevant in determining whether coverage is implicated–without pointing to any specific documents or document pages, and expect the insurance company to simply discover on its own whether coverage is implicated; and, even more so, expect and assert that the insurance company is on notice of everything that is contained in the hundreds of pages of documents. The allegations in the complaint, combined with the voluminous documents contained in Plaintiff's May 2005 mailing, fail to trigger a duty to defend on the part of Defendant.

**CONCLUSION**

Therefore, after reviewing the allegations of the underlying complaint and the documents contained in the May 2005 mailing, the Court finds that the allegations fail, as a

matter of law, to fall under the rubric of the AI endorsement. As such, Defendant had no duty to defend, much less indemnify, Plaintiff from the underlying complaint filed by CRIT. Defendant requests an award of attorneys' fees that it incurred in defending this lawsuit pursuant to Arizona Revised Statutes section 12-341.01(A) (2003). Given that the issue before the Court is an issue of first impression in Arizona, and in the Court's discretion, the Court denies Defendant's request for an award of attorneys' fees.

Accordingly,

**IT IS ORDERED** that Plaintiff Tri-Star Theme Builders, Inc./PCL Construction Services, Inc.'s Motion for Summary Judgment (Doc. # 32) is denied.

**IT IS FURTHER ORDERED** that Defendant OneBeacon Insurance Company's Cross Motion for Summary Judgment (Doc. # 70) is granted.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

DATED this 2nd day of September, 2009.

*[Signature]*
James A. Teilborg
United States District Judge